**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 10-4297**

───────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRUCE WAYNE MILLER,

Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.   Malcolm J. Howard, Senior District Judge.   (7:09-cr-00001-H-2)

───────────

Argued:  May 12, 2011                    Decided:  June 14, 2011

───────────

Before MOTZ and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

───────────

Affirmed by unpublished per curiam opinion.

───────────

**ARGUED:** Thomas Reston Wilson, GREENE & WILSON, PA, New Bern, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Kelly L. Greene, GREENE & WILSON, PA, New Bern, North Carolina, for Appellant.  George E. B. Holding, United States Attorney, Jennifer P. May-Parker, Thomas B. Murphy, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a jury trial, Bruce Wayne Miller was found guilty of: (1) interference with commerce by robbery, and aiding and abetting the same, 18 U.S.C. §§ 1951 and 2; and (2) aiding and abetting the use and carriage of a firearm during and in relation to a crime of violence, id. §§ 924(c) and 2. On appeal, Miller contends that his Sixth Amendment right to compulsory process was abridged by the district court. We affirm.

I

This case involves a robbery at Tobacco House #3, a convenience store located in Lumberton, North Carolina. At approximately 10:45 p.m., on October 28, 2008, George William Blackwell entered the store, purchased a drink, and left. Approximately five minutes later, he reentered the store, this time accompanied by Miller. As the pair entered the store, Blackwell pointed a gun at one of the store's employees, Yosef Gazali, who was standing behind the counter near the cash register. The pair repeatedly instructed Gazali to give them all of the money in the cash register. Initially, Gazali turned over only the $20 bills in the cash register. In response, Miller told Gazali to hand over all of the "f***ing money." After Gazali delivered all of the money (approximately $800.00)

from the cash register, Blackwell went behind the counter looking for the cash drawer that contained the state lottery receipts. As he moved toward the drawer, Blackwell passed a loaded shotgun that was stored behind the counter. From the drawer, Blackwell retrieved approximately $70.00. Meanwhile, Miller walked to a cooler in the store and grabbed a twelve-pack of beer. As the pair was leaving the store, Gazali grabbed the shotgun, pointed it at Miller and Blackwell, and pulled the trigger, but the safety was on, preventing the shotgun from discharging.

After Miller and Blackwell left the store, Gazali followed them, shotgun in hand, with the safety off. Gazali pursued the pair to the side of the store, where a red Mustang was parked. A shot was fired at Gazali, so he retreated, positioning himself near one of the doors to the store. Gazali then approached the Mustang and fired a shot at the car. As the car sped off, another shot was fired at Gazali, so he returned fire, hitting the back of the Mustang.

Shortly after the robbery, Detective Timothy Wilkins of the Lumberton Police Department was dispatched to the scene. Detective Wilkins interviewed Gazali and another store employee, Nasr Alnagger, and collected evidence outside of the store, including a shotgun shell casing and the twelve-pack of beer

that Miller had taken from the store, but had left in the parking lot.

Within a day of the Tobacco House #3 robbery, law enforcement officers began to suspect that Blackwell and his friend and associate, Dixie Lynn Oxendine, were involved in the robbery, because Blackwell was a suspect in two October 2008 bank robberies and Dixie Oxendine's red Mustang fit the description of the car described by Gazali as leaving the scene of the robbery at Tobacco House #3. By this time, a state warrant had been issued for the arrest of Blackwell in one of those bank robberies. Suspecting that Blackwell and Dixie Oxendine might be staying together, law enforcement officers investigated their whereabouts and discovered that Dixie Oxendine was staying at a Howard Johnson's hotel in Lumberton.

On the morning of October 31, 2008, law enforcement officers arrived at the Howard Johnson's. The law enforcement officers received information that Dixie Oxendine was sharing a room registered in her name with two adult males, later identified as Miller and Blackwell, and an adult female, later identified as Dawn Oxendine. Because of the threat of a shootout, the arrest plan involved getting one of the room's occupants to answer the door. Two detectives from the Lumberton Police Department and FBI Special Agent Frank Brostrom approached the room. After knocking on the door a couple of

times, Blackwell answered the door and was promptly arrested.

Following Blackwell's arrest, a protective sweep of the room was conducted. During the sweep, law enforcement officers recovered an AMT Automag II .22 Caliber Rimfire gun. A hat and jacket worn by Blackwell during the Tobacco House #3 robbery were also recovered.

Miller, Blackwell, and Dixie Oxendine were interviewed later that morning at the Lumberton Police Department. During her interview, Dixie Oxendine admitted that, on the night of the Tobacco House #3 robbery, she drove Blackwell and Miller in her red Mustang to the store to get cigarettes and beer. After they arrived, Blackwell "suddenly exited the car[,] . . . pulled out a gun . . . and walked towards the gas station with Mr. Miller." A short time later, Blackwell ran back to the car yelling: "Go, Dixie, go." Dixie Oxendine also recalled the exchange of shots between Blackwell and Gazali, leaving Miller at the scene, and picking him up later on while he was walking along a local highway.

During his interview, Miller initially denied knowing that Blackwell had robbed a bank. He also indicated that he neither saw Blackwell with a gun, nor knew he owned one. As his interview progressed, Miller's story changed. He admitted that he had lied about Blackwell because he did not want to tell on him; that he knew Blackwell owned a gun, having seen it about a

- 5 -

month before in Blackwell's back pocket; that he knew Blackwell had robbed a bank because the two had discussed it; and that he knew that Blackwell was wanted for bank robbery.

When asked about the Tobacco House #3 robbery, Miller initially said that he went into the store with Blackwell to buy beer and cigarettes, and, once inside the store, Blackwell suddenly pulled out a gun and "does this robbery." Miller said he then dropped his beer and ran out of the store, catching up later with Blackwell. However, after Miller was shown the video of the robbery, "he shut down," refusing to answer any further questions.

On January 8, 2009, Miller, Blackwell, and Dixie Oxendine were charged in an eight-count indictment. Counts One and Two charged Blackwell with bank robbery, id. § 2113(a), stemming from two October 2008 bank robberies, one on October 9, 2008, the other on October 21, 2008. Counts Three through Five related to the robbery of a BP Sun-Do convenience store in Lumberton on October 13, 2008.[1] Counts Six through Eight related to the Tobacco House #3 robbery. Count Six charged Miller,

---

[1] Count Three charged Blackwell and Dixie Oxendine with interference with commerce by robbery, and aiding and abetting the same, 18 U.S.C. §§ 1951 and 2. Count Four charged Blackwell with using and carrying a firearm during and in relation to a crime of violence, id. § 924(c), and Count Five charged Blackwell with possession of a firearm by a convicted felon, id. § 922(g)(1).

Blackwell, and Dixie Oxendine with interference with commerce by robbery, and aiding and abetting the same, id. §§ 1951 and 2, and Count Seven charged Miller, Blackwell, and Dixie Oxendine with using and carrying a firearm during and in relation to a crime of violence, and aiding and abetting the same, id. §§ 924(c) and 2. Count Eight charged Blackwell with possession of a firearm by a convicted felon, id. § 922(g)(1).

Prior to Miller's trial, Blackwell pled guilty to Counts One, Six, and Seven pursuant to a plea agreement, and Dixie Oxendine pled guilty to Counts Six and Seven, also pursuant to a plea agreement.[2] On December 1, 2009, Miller and the government each filed their respective proposed witness list, and each list included Blackwell as a possible witness. On the same day, Miller's two-day jury trial began.

The government presented six witnesses in its case-in-chief, and none in rebuttal. The government's case rested on, among other things, statements made to law enforcement officers by Miller and his co-defendants, the testimony of the six witnesses called by the government, and certain physical evidence recovered at the scene, including a video of the robbery, the twelve-pack of beer left at the scene by Miller,

---

[2] On October 13, 2009, Dixie Oxendine was sentenced to a total of eighty-four months' imprisonment. On February 9, 2010, Blackwell was sentenced to a total of 155 months' imprisonment.

and the shotgun shell casing fired from the shotgun used by Gazali.

At the beginning of the second day of trial, just before the government called its last witness, Blackwell's counsel notified the district court that Miller intended to call Blackwell as a witness and that he instructed Blackwell not to testify. In response, the district court engaged in an extensive colloquy with Blackwell's counsel, Miller's counsel, and the Assistant United States Attorney. Blackwell's counsel was concerned that, by testifying, Blackwell would place in jeopardy the application of an acceptance of responsibility downward adjustment at his sentencing, and, far worse, would result in the application of an obstruction of justice enhancement. Blackwell's counsel also was concerned about Blackwell's recollection of the events, considering "some of the things that were in his system at that time," namely, alcohol and Xanaxes. Miller's counsel stressed that all the defense wanted was for Blackwell to testify truthfully, reasoning that truthful testimony would have no impact on Blackwell's sentencing. Although Miller's counsel was not exactly clear about how that truthful testimony would be favorable to Miller, the record suggests that Miller's counsel believed that Blackwell would testify that it was his idea to rob the Tobacco House #3 and not Miller's, and that Blackwell would say that

- 8 -

Miller had no idea that a gun would be used in the robbery. At the conclusion of its colloquy with counsel, the district court decided that Blackwell would testify outside the presence of the jury with his attorney by his side, thus, allowing the district court to decide which questions Miller's counsel later could ask Blackwell in the presence of the jury.

At the beginning of the voir dire examination by Miller's counsel, Blackwell answered a series of questions concerning the contents of his plea agreement and the clothing he wore on the night of the Tobacco House #3 robbery. At this point, the district court remarked that, "so far . . . there is no basis for the Fifth Amendment by the testifying witness." Blackwell also identified the AMT Automag II .22 Caliber Rimfire gun and a clip for the gun, and admitted the gun was used during the robbery. He answered questions concerning the red Mustang and who was, and who was not, present in the car leaving the scene of the robbery. The district court did, however, allow Blackwell, with the assistance of his counsel, to assert the Fifth Amendment privilege against self-incrimination to questions concerning Miller's involvement in the robbery, including whether it was Miller's idea to rob the store, whether Miller was with Blackwell when the store was robbed, whether Miller touched the gun, and whether Miller was in the car as it left the store.

At the conclusion of Blackwell's testimony, the district court recessed court to allow it and counsel to further research the Fifth/Sixth Amendment issue. The district court discussed the issue with counsel in chambers, and, later, in open court, but outside the presence of the jury, ruled that: (1) Miller could call Blackwell to testify; (2) Blackwell could testify with his attorney at his side; and (3) it would listen to the "questions and make rulings if [it] believe[d] there is a basis for a Fifth Amendment issue."

Blackwell was the only witness called by the defense. Consistent with the district court's ruling, he testified with his attorney at his side. During his testimony, Blackwell acknowledged his plea agreement and identified the hat and jacket he wore during the Tobacco House #3 robbery. As allowed by the district court, Blackwell asserted the Fifth Amendment privilege against self-incrimination in response to only one question, whether he was "carrying or using [the] gun when [he] entered the store on October 29." Blackwell did acknowledge, in response to Miller's counsel's next question, that he pleaded guilty to brandishing a firearm during the robbery. He also acknowledged that the hat and gun recovered from the Howard Johnson's hotel were used during the robbery. Blackwell identified the red Mustang and acknowledged that Miller was not in the car as it sped away from the scene. In response to the

question of whether Miller knew that he was going to rob the store, Blackwell replied: "I don't remember nothing much about that night that would hardly help anybody." In response to a similar question, "you didn't tell [Miller] that you were going to rob the store before you robbed it," Blackwell replied: "I might have did. I don't – I can't remember."

Following closing arguments by counsel and the district court's jury instructions, the case went to the jury. The jury convicted Miller on both counts. He was sentenced to a total of 324 months' imprisonment, and this timely appeal followed.

II

Miller contends that his Sixth Amendment right to compulsory process was violated by the district court. In particular, he contends that the district court did not conduct a sufficient inquiry into the validity of Blackwell's assertion of his Fifth Amendment privilege against self-incrimination and thus violated his Sixth Amendment right to compulsory process. Alternatively, Miller suggests that, to avoid the Sixth Amendment violation, the district court was required to order the government to grant Blackwell immunity. We reject these contentions.

The Supreme Court has "broadly construed" the protection afforded by the Fifth Amendment privilege against self-

incrimination.  Maness v. Meyers, 419 U.S. 449, 461 (1975); see also Hoffman v. United States, 341 U.S. 479, 486 (1951) (instructing lower courts to give the privilege a "liberal construction").[3]  Thus, the privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  Hoffman, 341 U.S. at 486.  A defense witness's invocation of the privilege is proper unless it is "perfectly clear, from a careful consideration of all the circumstances in the case," that the defense witness "is mistaken" and his answers could not "possibly have" a "tendency to incriminate."  Id. at 488 (internal quotation marks omitted); see also United States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007) ("Because requiring a witness to prove the necessity of the privilege would often vitiate the privilege itself, 'it need only be evident from the implications of the question, in the

---

[3]  The Fifth Amendment to the United States Constitution provides in relevant part: "No person . . . shall be compelled in any Criminal Case to be a witness against himself."  U.S. Const. amend. V.  Like other provisions of the Bill of Rights, this guarantee "'was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed.'"  Hoffman, 341 U.S. at 486 (quoting Feldman v. United States, 322 U.S. 487, 489 (1944)).

setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'") (quoting Hoffman, 341 U.S. at 486-87). Moreover, a defense witness retains the privilege even after pleading guilty, and a sentencing court may not draw adverse inferences from a pleading defendant's silence. Mitchell v. United States, 526 U.S. 314, 329-30 (1999); see also id. at 326 (noting that the Fifth Amendment privilege against self-incrimination generally remains available, absent a valid waiver, until a defendant's "sentence has been fixed and the judgment of conviction has become final"). And it is the responsibility of the district court to determine whether the privilege should be invoked. Hoffman, 341 U.S. at 486.

A witness's Fifth Amendment privilege against self-incrimination often can rub up against a defendant's right under the Sixth Amendment to compulsory process.[4] Thus, if a defense witness refuses to testify on the basis of the privilege, the district court "must make a proper and particularized inquiry into the legitimacy and scope of the witness'[s] assertion of

_____

[4] The Constitution guarantees a criminal defendant's right to present a complete defense. United States v. Lighty, 616 F.3d 321, 358 (2010). This right is grounded either in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process. Id.

the privilege." Gaskins v. McKellar, 916 F.2d 941, 950 (4th Cir. 1990). The privilege operates on a question-by-question basis, United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997), but a "witness may be totally excused . . . if the court finds that he could legitimately refuse to answer any and all relevant questions." Gaskins, 916 F.2d at 950.

In this case, the district court proceeded with commendable caution. It prohibited Blackwell from invoking the Fifth Amendment privilege against self-incrimination on a wholesale basis. In an attempt to narrow the assertion of the privilege, the district court conducted a thorough voir dire hearing to ascertain the questions Miller's counsel sought to pose and the scope of the privilege sought by Blackwell. When Blackwell eventually testified before the jury, the district court allowed Blackwell's counsel to stand by his client to confer, and the procedure correctly allowed Blackwell, as opposed to his attorney, to assert the privilege, and allowed the district court to rule on a question-by-question basis. Understandably, Blackwell's counsel sought to prevent Miller's counsel from eliciting testimony concerning Miller's involvement in the crime, considering Blackwell's inability to recall specifics and the effect such vague testimony would have on Blackwell's ability to receive favorable treatment at sentencing. Clearly, when one considers the video evidence before the jury and

Miller's knowledge of the gun, testimony from Blackwell tending to exculpate Miller would have subjected Blackwell to the charge of perjury. Moreover, testimony from Blackwell exculpating Miller would have jeopardized Blackwell's ability to receive an acceptance of responsibility downward adjustment at his sentencing, and perhaps resulted in an enhancement for obstruction of justice as well. Thus, Blackwell's counsel prudently sought to protect Blackwell from further charges and increased penalties. Accordingly, we reject Miller's argument that the district court did not conduct a sufficient inquiry into the validity of Blackwell's assertion of the privilege.

We also find no merit to Miller's contention that the district court was required to order the government to grant Blackwell immunity. It is well-settled that a district court does not have the authority to grant immunity, even where the grant of immunity would allow a defendant to present material, favorable evidence. United States v. Moussaoui, 382 F.3d 453, 467 (4th Cir. 2004); United States v. Abbas, 74 F.3d 506, 511-12 (4th Cir. 1996). However, a district court can compel the government to "grant immunity when (1) the defendant makes a decisive showing of prosecutorial misconduct or overreaching and (2) the proffered evidence would be material, exculpatory and unavailable from all other sources." Id. at 512.

In this case, there is no evidence of misconduct or overreaching by the government. Indeed, there is no suggestion that the government delayed Blackwell's sentencing to preserve his Fifth Amendment privilege against self-incrimination or did anything to gain an unfair tactical advantage.

We also note that, assuming there was a Sixth Amendment error in this case, such assumed error would be harmless. See United States v. Sayles, 296 F.3d 219, 223 (4th Cir. 2002) (noting that a Sixth Amendment compulsory process claim is subject to harmless error analysis). A Sixth Amendment compulsory process error is "harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Id. (quoting Neder v. United States, 527 U.S. 1, 18 (1999)).

In this case, the evidence of Miller's guilt was overwhelming. Gazali testified that Miller and Blackwell entered the Tobacco House #3, with Blackwell pointing a gun at him. Both Miller and Blackwell approached the counter and demanded money. Gazali confirmed his testimony with the video of the robbery, which showed Miller and Blackwell together entering the store with a gun drawn and pointed at Gazali, repeatedly threatening Gazali, and demanding money. Dixie Oxendine admitted to driving Miller and Blackwell to the store where Blackwell pulled out a gun, and, together with Miller,

- 16 -

went into the store.  In his statement, Miller admitted that he knew Blackwell owned a gun, having seen it a month prior to the robbery, and that he knew Blackwell had robbed a bank.  Miller also lied concerning his knowledge of, and participation in, the robbery.  Moreover, any testimony from Blackwell was suspect, because he testified that he could not "remember . . . much about that night that would hardly help anybody."  Given the evidence at trial, the result would not have been any different had Blackwell been willing to testify favorably (albeit falsely) for the defense.  Unquestionably, a rational jury presented with such testimony would have found beyond a reasonable doubt that Miller was guilty of the charges contained in Counts Six and Seven of the indictment.

## III

For the reasons stated herein, the judgment of the district court is affirmed.

<u>AFFIRMED</u>